Patrick Missud #219614
91 San Juan Ave.
San Francisco, CA, 94112
415-845-5540 phone
415-584-7251 fax
missudpat@yahoo.com

Attorney for Class Action Plaintiffs

**UNITED STATES DISTRICT COURT**
**OAKLAND DIVISION**
UNLIMITED CIVIL JURISDICTION

CLASS ACTION
DEMAND FOR JURY TRIAL

PATRICK A. MISSUD; JULIE E. MISSUD;
and those similarly situated
Plaintiffs,

     vs.

OAKLAND COLISEUM JOINT VENTURE;
CITY OF OAKLAND; ALAMEDA
COUNTY; SMG CORPORATION; DOES 1-
100; ROE Corporations I-X
Defendants.

Case No.: 12-CV-2967-JCS

**_FIRST AMENDED_ COMPLAINT FOR
VIOLATIONS OF THE CLEAN WATER
ACT, RESOURCE CONSERVATION AND
RECLAMATION ACT, AMERICANS WITH
DISABILITIES ACT, NATIONAL
HIGHWAY SAFETY AND TRAFFIC ACT,
CAL-TRANS VIOLATIONS;
NEGLIGENCE; BREACH OF CONTRACT;
FRAUDULENT INDUCEMENT;
B&PC§17,200 DECEPTIVE TRADE
PRACTICES; PUNITIVE DAMAGES;
INJUNCTIVE RELIEF SOUGHT**

_____

i. PRELIMINARY MATTERS

       On March 5, 2013 per this court's Order and two granted extensions of time in which to

file, judge Spero allowed registration of this First Amended Complaint.  This court's perceived

deficiencies outlined in its "Analysis" at Order #46:19/1 are addressed in respective

"Amendment to Complaint" sections below.  Concurrently filed herewith is also a "Response to

the March 5, 2013 Order" which addresses other pertinent issues raised in the Order such as

items under "Judicial Notice" 15/13; findings that federally-protected Informant Missud was

declared "vexatious;" various footnotes like at page 18; and admissibility of evidence at 18/16.

I. INTRODUCTION

On the evening of June 7, 2011, a U-2 concert [Concert] was hosted at the Oakland Coliseum aka the "O.Co" [Venue]. As detailed in the Statement of Facts, Defendants' oversight and mis-management of the 69,000 anticipated Invitees who were expected to attend for at least one year, was a Fiasco. Subsequent inspection of the Venue's grounds uncovered violations of at least three federal acts. Communication with Concert-goers yielded evidence that the Defendants intentionally and/or negligently breached their contracts with the class action Plaintiffs.

II. JURISDICTION

The Federal District Court of Northern California is a court of general jurisdiction. These causes of action come under its authority by way of subject matter jurisdiction and violation of federal laws. Violations of the Clean Water Act, Resource Conservation and Recovery Act, Americans with Disabilities Act, and National Highway Safety and Transportation Act are alleged and properly filed in this court. Further, the Defendants' other intentional and/or negligent actions and pendant violations were committed within this district.

III. INTRADISTRICT ASSIGNMENT

Northern California's Oakland Division is the proper venue for this action pursuant to 28 U.S.C. §1391. It's where all of the transactions, acts, practices, and courses of conduct constituting violations of the federal and state laws alleged in this complaint occurred. The City and County of Oakland is also where this Division's federal building is located. The Defendants committed their violations within 5 miles of this federal court house. It is believed that their records are located within this County. The majority of class action Plaintiffs live within just 50 miles of this Oakland Division.

IV. PARTIES

Amendment to Complaint Re: Order 37/14

The class action Plaintiffs [Class] are or will be represented by any combination of four similarly aggrieved Invitees who have tentatively agreed or already committed to becoming lead Plaintiff(s) in this case. They are Mrs. Missud, Eric S., Sameer Q., Heather B., and others who will likely be interested after this case has survived the present motions to dismiss and/or additional Class members have been located. Missud is now only the attorney of record herein.

The Class size ranges from several hundred to several thousand ordinary, average-income American citizens.  They have no special interests apart from their love of music.  Most Class members live in cities throughout the Bay Area including Gilroy, Napa, and Sacramento.  Others of the Class came from out of state to attend the much anticipated and historic Concert.  Individual members of the Class do not have the financial resources to separately petition their grievances which is the reason why this case is filed as a class action.

The Defendants on the other hand are a specially-interested consortium of private corporate entities, the City of Oakland, and Alameda County.  Their joint venture, better known as the Oakland Coliseum Joint Venture [OCJV], is in the business of making money….. and lots of it.  The OCJV expected that the ordinary, non-corporate citizens who were damaged by at least several hundred dollars each could not individually afford justice, and thusly expected to be let off the hook to pocket their enormous profits.  Evidence will prove that when given the opportunity, the OCJV cuts services to maximize profits at the expense of their consumer-invitees.  That is exactly what happened on June 7, 2010 and is still occurring for all of the OCJV's Invitees for every event scheduled at the Venue.  Since the evening of the June 7, 2011 Fiasco, every federal law and safety issue that was egregiously violated by the OCJV, and particularly identified below, still has not been corrected despite specific, repeated notice of the discrete violations.  The OCJV continues to flaunt federal and state laws.[1]

The violations continue despite the fact that among the Defendants is an international company whose central business is to professionally manage venues such as the O.Co Coliseum. In their very own words:

> "From space utilization to HVAC to security systems and in every discipline necessary, SMG will have an expert in the field available to you….. This involves reviewing/forecasting all event projections including attendance, ticket/rent revenues, … all staffing assumptions, …."
> http://www.smgworld.com/operations_development.aspx; and
> "Our successful growth has been built on the many partnerships, relationships, and resources we have developed with our clients — both municipal and private. This unique combination of resources, relationships, and expertise has allowed SMG to define and refine the industry throughout its history.  Our ownership and team of

---

[1] At the time of filing this First Amended Complaint, some violations seem to have been stopped and remedial measures may be taking place.

dedicated corporate support personnel make us unrivalled in the field of private facility management."
http://www.smgworld.com/company_history.aspx [2]

V. DOES, ROES

Missud is ignorant of the true names and capacities of the Defendants sued herein as DOES 1-100, and ROES I-X; and for that reason has sued such Defendants under such fictitious names.  Plaintiffs reserve their rights, and will seek leave of the Court to amend this Complaint to identify said Defendants when their identities have been ascertained.  Missud is informed and believes, and thereon alleges, that each of the fictitiously named Defendants was in some manner liable and legally responsible, in that their conduct caused the damages and injuries set forth herein.

VI. CONCERTED ACTIONS

Missud is informed and believes, and thereon alleges, that at all relevant times Defendants, and each of them, were the knowing agents and/or alter egos of one another, and that Defendants directed, ratified, and/or approved the conduct of each of the other Defendants, and each of their agents or employees, and are therefore vicariously liable for the actions or omissions of their co-Defendants, their agents and employees, as more fully alleged herein. Moreover, all the Defendants agreed upon, approved, ratified, and/or conspired to commit all of the acts and/or omissions alleged in this Complaint.

VII. JUDICIAL NOTICE OF WEB BASED INFORMATION

Federal Courts throughout the nation and even those applying California law within California's Northern District have deemed that web based information is reliable.  *Austin v. American Association of Neurological Surgeons*, 253 F. 3d 967, 7th Cir. 2001, (citing several websites and noting that "there is an abundance of up-to-date literature easily retrievable from the World Wide Web.);  *Grimes v. Navigant Consulting Inc.*, 185 Supp. 2d 906, 913 and note 7, N.D. Ill. 2002, (taking judicial notice of information published on the internet and observing that "in other contexts, the Seventh Circuit has approved of taking judicial notice of reliable

---

[2] At the time of filing this First Amended Complaint, Missud understands that SMG is no longer (mis)-managing the O. Co. Venue, nor any other stadium in California.

information published on the internet [citations].); *Modesto Irrigation District v. Pacific Gas and Electric Co*., 61 F. Supp. 2d, 1058, 1066, N.D. Cal. 1999, (taking judicial notice of information where it "is readily accessible through the internet."). The following paragraphs may include embedded hypertext links which incorporate by reference reliable web-based, internet information, publications and literature. Said links supplement and corroborate the following allegations, and are incorporated herein.

Amendment to Complaint Re: Order 15/13 and 38/14

Should these Defendants renew their Motion to Strike Web Sites and Web-based content, then the Plaintiffs will oppose at that time.

VIII. STANDING AND CLASS ACTION STATUS

A.     Citizen suits can be filed to enforce provisions of the Federal Acts listed in the caption and petition courts to impose injunctions, fees etc. for violations of said Acts.

http://en.wikipedia.org/wiki/Citizen_suit

Missud was also an Invitee who purchased two tickets to the Concert in exchange for admission to the Venue and use of all the necessary Venue Facilities. Once at the Venue, Missud discovered that the necessary Facilities were either severely deficient or non-existent, and that only one of his tickets would be honored by these Defendants. At least several hundred class action Plaintiffs were similarly damaged.

B.     This Class Action meets the statutory prerequisites for the maintenance of a Class Action as set forth in FRCP 23 and CCP §382 et seq., in that:

(a) The persons who comprise the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a class will benefit the parties and the Court. The class is expected to exceed 400 Plaintiffs: http://www.oaklandfiasco.com/  and http://dustinkeirstead.blogspot.com/2011/06/u2-traffic-nightmare-masses-speak-part.html;

(b) Nearly all factual, legal, statutory, declaratory and injunctive relief issues that are raised in this Complaint are common to the Class and will apply uniformly to every member of the Class. The common questions of fact and law which predominate in this class action non-exhaustively include:

1. Whether the Venue's Facilities are illegally used by the Defendants in violation of the Clean Water Act [CWA];

2. Whether the recently tax-payer restored and reclaimed Oakland Estuary, a federally protected public wetland, is being polluted by Defendants' neighboring private and lucrative financial enterprise which includes parking greasy, leaking cars in the 'overflow parking lot' during Defendants' many events;

3. Whether these Defendants' immediately adjoining "overflow parking lot" is a "point source emitter" as defined by the EPA's National Pollutant Discharge Elimination System;

4. Whether these Defendants' immediately adjacent "overflow parking lot" creates wastewater as per the EPA's definition of industrial site drainage which includes silt, sand, alkali, oil, and chemical residues;

5. Whether these Defendants should install a separate storm drain/runoff system to protect the immediately adjacent, federally protected wetlands, from the chemical residues which are leaching into the groundwater immediately under their "overflow parking lot;"

6. Whether the groundwater is in fact being contaminated by various alkali compounds, antifreeze, and motor and transmission oils, and if this in turn invokes provisions of the Reclamation and Conservation of Resources Act [RCRA];

7. Whether these for-profit Defendants' improper use of their "overflow parking lot," which has already created industrial-type point-source pollution, will now require that they sponsor an environmental impact report to document the ongoing damage to the public's Oakland Estuary;

8. Whether the 15 foot deep, 25 square yard wetland protected by state and federal authorities for the expensive Oakland Estuary restoration project, and existing within the boundaries of these Defendants' "overflow parking lot," located just fifty feet from the Oakport Street and Zhone Way intersection, and situated just fifty feet from the elaborate pedestrian rest area constructed at the end of Zhone Way, is also being polluted by the parked cars and trash discarded by the Defendants' unsupervised Invitees: [ http://maps.google.com/ and enter <oakport st & zhone way Oakland 94621>; use the 'street view' function and scroll right to the palm tree];

9. Whether these Defendants are required to provide trash receptacles, and service the same, to manage the solid wastes known to be discarded at and around their "overflow parking lot" and within the 25 square yard state and federally protected wetland;

10. Whether Section 309 fines should be imposed on these Defendants for each day of violation, starting from the day they knew of their CWA violations since June 16, 2011;

11. Whether the Section 309 fines should be set at the minimum $2,500 for the first day of willful violation, or increased to $25,000/day for the continued brazen violation of the CWA http://en.wikipedia.org/wiki/Clean_Water_Act#cite_note-7;

12. Whether the Venue's Facilities, which are open to the public and offered for use by the City of Oakland and County of Alameda, violate the Americans with Disabilities Act [ADA];

13. Whether the Defendants are to provide state and federally mandated ADA access, or other amenities such as lighting and bathrooms, appurtenant to its "overflow parking lot" and/or any other Facilities used by consumer Invitees;

14. Whether these Defendants must provide minimally required walkways, ramps, transitions and safety systems at and around their "overflow parking lot" which is used by their sometimes aged or otherwise disabled consumer-Invitees;

15. Whether the Venue's Facilities violate the National Highway Safety and Transportation Act [NHSTA];

16. Whether the Defendants are to provide safety separation between pedestrians and vehicular traffic per the NHSTA and state CALTRANS laws;

17. Whether the Defendants are to lawfully provide security lighting to identify the many public hazards such as rusted barbed wire surrounding the perimeter of their "overflow parking lot," potholes and ruts found throughout their "overflow parking lot," and piles of discarded debris found within and around their "overflow parking lot;"

18. Whether the Defendants, among which include Pennsylvania's SMG Corporation, should be allowed to reap financial windfalls from California consumers, all the while polluting California tax-payer funded reclamation projects like the Oakland Estuary for which a substantial portion of

$198 million in bonds were raised by the Oakland Trust for Clean Water and Safe Parks per measure DD in 2005: http://www.waterfrontaction.org/dd/archive/dd_council_report_2-8-05.pdf;

19. Whether the Defendants breached their contract with the Plaintiffs, and third party beneficiaries, by not providing the professional services that they admit to providing per their own website http://www.smgworld.com/operations_development.aspx;

20. Whether the Defendants breached their contract with the Plaintiffs, who bought licenses to use the Venue and its amenities, by not making the proper "staffing assumptions" or providing the minimum required staff to manage the Concert which was planned for two years;

21. Whether the Class action Plaintiffs get their money back for the Defendants' breach of contract……

(c) The representative Plaintiff's claims are typical of the claims of each member of the Class. Plaintiff Missud, only one of many consumer-Invitees, is acting as the class action representative [Plaintiffs]. In this case, Plaintiffs purchased one or more tickets/Licenses to enter the Venue on the evening of June 7, 2011. Without legal justification, the Plaintiffs were denied access to the Venue with at least one of said Licenses. The Plaintiffs properly planned their evenings allowing ample time to access the Venue.

(d) The representative Plaintiffs will fairly and adequately represent and protect the interest of the Class, and will retain additional counsel which is competent and experienced in Class Action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class Members.

IX. STATEMENT OF FACTS:

On or around July 13, 2010, management for the U-2 band announced that their original concert would have to be rescheduled. Due to unforeseen circumstances the Concert was rescheduled for June 7, 2011 the following YEAR. Many Plaintiffs had already purchased their Licenses months prior to July 2010 in anticipation of the Concert at the Venue. Both the originally scheduled and re-scheduled Concerts received lots of media coverage and were thusly sold-out months in advance.

http://www.pressdemocrat.com/article/20100713/ENTERTAINMENT/100719890

The Defendants knew that they had a sold-out show since July 2010. Defendants had over a year to appropriately plan for the 69,000 invitees expected to attend the Concert. The Defendants have years of experience in hosting: professional baseball and football games; tractor pulls; rodeos; various other sporting events; other concerts; public speakers; trade shows; and children's events. http://www.coliseum.com/events/sports.php

Well before June 7, 2011, the Defendants knew that they were to provide the Plaintiffs with certain benefits or facilities which are ancillary to the Venue. Along with providing access to the Venue, the Defendants were also to provide security; safe premises free of dangerous conditions; sanitary facilities; light; ventilation; water; safety evacuation plans; ADA ramps, walks, and elevators; on-site emergency services; and parking to name but a few ancillary benefits, services, and facilities which are typically required when publicly hosting 69,000 paying Invitees.

X. CAUSES OF ACTION (as against all Defendants jointly and severally)

The above paragraphs are incorporated herein as if fully set forth below.

Amendment to Complaint Re: Order starting at page-21/line-1: THESE DEFENDANTS, PUBLIC ENTITIES, AND CORPORATE SPECIAL INTERESTS RECEIVED PROPER NOTICE OF THEIR VIOLATIONS PRIOR TO MISSUD'S FILING SUIT.

These Defendants disingenuously claim they didn't receive 60 days' notice that they breached their contract, and violated four federal acts and California's B&PC among other claims. Theirs' is a blatant lie. For lying to this court, the Defendants should be raked over the coals and literally made to pay. The consortium of special intere$t$ knew of its many violations prior to July 8, 2011. On or about that day, the Defendants retained attorney Elliott Myles who claimed to represent the entire OCJV. Myles received an email attaching a letter specifying future causes of action and the federal acts already violated. He was also warned that the OCJV's further violations would lead to an expensive federal suit- *just like this one*. He was supposed to effectively communicate and adequately inform his clients of all Missud's claims, especially since a represented party isn't supposed to get direct communications from an attorney like Missud who is either threatening or filed suit.

<u>These Defendants had 335 days to make restitution to the Plaintiffs, and stop violating</u> <u>strict-liability Congressional environmental acts prior to Missud's filing this unnecessary suit.</u> Some violations of environmental acts prescribe up to $25,000 in penalties for each day of willful violation.  Perhaps now they'll all refund Plaintiffs' dis-honored seat licenses, and invest in a dozen $20 trash cans to confine the refuse they so brazenly dump around Oakport Street and Zhone Way.  [See ####; 11-16-12 Declaration Exhibits 1 & 2 in Support of Opposition].

A.    VIOLATIONS OF THE CLEAN WATER ACT

These Defendants have a duty to follow federal law which includes abiding by the CWA. These Defendants willfully violated the CWA with discharges of storm water, untreated sewage, and other pollutants into the Oakland Estuary, a protected state and federal wetland.

Amendments to Complaint Re: Order 21/23

These Defendants fraudulently claimed they didn't get 60 days' notice from Missud prior to his initiating this federal suit alleging violations of the CWA.  That's just plain false.  On June 15, 2011 the OCJV's (the Joint Venture comprised of all of these Defendants) attorney Elliot Myles sent Missud an email which began as such: "Dear Mr. Missud: Oakland Coliseum Joint Venture has forwarded your correspondence to me for response….."  He thereafter made self-serving, exculpatory statements on behalf of all Defendants and closed with an admonishment that Missud shouldn't try any funny business while Myles was away on vacation:

> "Please note that I am the only attorney at Myles Law Firm, Inc. My office will be closed for a pre-scheduled vacation from June 18 to July 5, 2011. During this period, I will be unavailable for all purposes including, but not limited to, receiving notice of any kind, appearing in court, responding to ex parte applications or attending depositions. Purposefully scheduling a conflicting proceeding during this time without good cause is sanctionable conduct pursuant to ***Tenderloin Housing Clinic v. Sparks*** (1992) 8 CA4th 299."

Missud complied and didn't schedule any Ex-Parte Motions for instance.[3]  However, he continued to give the OCJV notice of its ongoing violations of the CWA, RCRA, ADA etc.

---

[3]  Note that courts treat *Tenderloin* violations differently when made by well-connected Attorneys working at corporate defense firms, as compared to Pro-Se's who identify multi-billion-dollar corporate racketeering that defense Attorneys $eek to $upre$$.  The Attorneys are allowed to schedule Ex-Parte motions knowing their adversaries are out of town and only get a hearty "Good to see you again" from judges like Elain Wick when brought before her to answer for their crystal-clear violations.  [See the "Response to the March 5, 2013 Order"].

When Myles came back from vacation on July 5th, he brow-beat Missud for having provided his clients additional notices they now claim weren't received:

> "Dear Mr. Missud: On Wednesday, June 15, 2011, I wrote you stating that I represented OCJV with respect to the claims you raised on behalf of your wife with respect to the U2 Concert. In the same letter, I advised you that I would be out of the country until July 5, 2011. Between June 15, 2011, and today, you have contacted my client twice directly (in violation of the California Rules of Professional Conduct. Please cease from contacting my client directly. All correspondence should be with this office. Future direct communications with my client will be handled according to the RPC. As stated in my letter to you of June 15, 2011, it is my understanding that the grounds set out in your letters are not accepted by the promoter as grounds for a refund. In the next few days, I will be researching applicable statute and case law obligating my client to make any refund. Elliott A. Myles, Esq."

*To recap*: These Defendants violated all sorts of state and federal laws; got very specific and numerous notices within 9 days' discovery of the blatant violations; had 364 days to comply with statutes, codes, ordinances, rules, and mandates; …… and yet did absolutely nothing. Now they're crying to this court feigning that they simply didn't know or get adequate notice?!??!?!? For thi$ lie alone, jurisdiction over these Defendants should immediately be exercised.

*In addition*, various state and federal Department of Justice agents received notice of the OCJV's violations. The DOJ's Wong and Reding who are attorneys of record for C:11-3567 and 12-161, as well as agents from the FBI, who will for the moment remain un-named, knew of and received notice of the OCJV's violations in real-time. Any and all officials in a position to act were notified of the OCJV's ongoing violations. The principle actors and violators, the OCJV, did nothing but brazenly continue polluting the Estuary.

*In regards to standing*, Missud hereby avers and swears under the penalty of perjury that but-for the disgusting condition of the re-polluted, reclaimed grounds surrounding the Oakland Estuary near Oakport and Zhone Way, that he would have continued using the nature walk and benches while having lunch on his way to Pick-n-Pull located behind the O-Co. coliseum. Missud frequently goes to P-n-P to get parts for restoring his small fleet of cars. Either before or after getting parts, he used to have lunch at the Estuary until the number of flying papers and trash exceeded the winged fauna which used to inhabit a once-restored, unblemished marsh.

This should suffice to establish standing per *Friends of the Earth* 528 US 167 as cited in Order 22/13 et seq.[4]

Per the court's own cited case law, these amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

B.    VIOLATIONS OF THE RESOURCE CONSERVATION AND RECLAMATION ACT

Defendants have a duty to follow federal law which includes abiding by the terms in the RCRA.  These Defendants willfully violated the RCRA with discharges of storm water, untreated sewage, and other pollutants into the Oakland Estuary, a reclaimed state and federal wetland.

Amendments to Complaint Re: Order 23/8

As discussed supra, Missud notified all required entities and all Defendants who've already lied about not receiving proper notice.  This court is now in a position to correct these Defendant$' lies, and non-compliance with RCRA which included using the overflow lot as a landfill.  This court can actually issue a favorable decision as outlined in Order 24/8 to redress these Plaintiffs' claims, enjoin these Defendants from further damaging the Estuary, and recompense the hard-working tax-paying public whose funds were used to restore the Estuary *twice*.

These amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

C.    VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

Defendants have a duty to follow federal law which includes abiding by the terms in the ADA.  These Defendants willfully violated the ADA by failing to provide adequate walkways, railings, landings, ramps, and other components prescribed by the Act.

Amendment to Complaint Re: Order 24/18

---

[4]  Note that since Missud filed suit, the powers that be, and who are in charge of the 'overflow lot' have literally cleaned up their act.  The: lot's been graded and is rut-free; area routinely patrolled for debris and trash; grasses are growing where tire treads once scarred the land; collapsed fences have been removed and/or repaired; rusty barbed wire replaced with new; and various other improvements.  Now that the area isn't disgusting anymore, Missud will return to lunch at the Estuary and park in the public lot overlooking the wooden foot-bridge crossing over the Marsh appurtenant to Southbound 880's on-ramp.  See Google ™ Earth's or Maps' aerial map(s).

This court listed in its Order a plethora of binding SCOTUS precedent and federal code defining when a disabled person has standing under the ADA. "The ADA provides a 'broad mandate' to eliminate discrimination against disabled individuals… courts should take a 'broad view of constitutional standing,' …"

Missud is disabled within the meaning of the Act.[5]  General practitioner Stephen M. Knox referred Missud to two specialists to diagnose his ailing back.  In January 2010 Missud met with Orthopedic/Sports Medicine Surgeon Chris Cox at 3838 California Street, Suite 715. Cox took X-rays and recommended a ¾" lift in Missud's right shoe to 'even him out.'  If that didn't quell the sciatica shooting down his right leg, they would try something else.  By March 2011 the sciatica returned with a vengeance and limited Missud's mobility to all of 2 City blocks.  In fact, Missud's condition is even documented by this federal court for case C:11-1856-PJH docket #60, 2-8-12 hearing transcript at page 5/19 wherein judge Hamilton allows Missud to argue from a seated position.  By March 2011 returned to Knox who then referred him to Saint Mary's Spine Center.  Dr Cohen sent Missud to RadNet Imaging for an "MRI Spinal Cord Lumbar w/o Contrast."  Those results were in turn sent to St. Mary's Dr. Zucherman who then told Missud that he had severe sclerosis starting from L-1; recommended physical therapy; told to stop all hands-on building-contracting duties; advised to stop walking but take-up bicycling, opined that a back-brace would be of benefit until the time that cortisone injections were required to mask the pain.  Zucherman also showed Missud a fabulous titanium gadget that could ultimately be installed if all else failed.  Missud's medical records are available for perusal.[6]

At Order 25/11 this court quoted several federal holdings: "a plaintiff must demonstrate that he or she has suffered an injury in fact traceable to the defendant's actions and that the injury can be redressed by a favorable decision, …to obtain injunctive relief a plaintiff must demonstrate a real immediate threat of repeated injury in the future, … actual injury does not

---

[5] If these Defendants protest Missud's twin-stutus as an ADA member and attorney of record in this case, then severance of this claim is an option.  Missud will then associate with ADA rights group to separately litigate the ADA claim on his behalf.
[6] California's First District Court of Appeal Division III also made accommodations for Missud's disability per its November 22, 2011 order at page 2 fn-1.

require that a barrier completely preclude a plaintiff from entering or using a facility in any way, …rather it is sufficient that the barrier interfere with the plaintiff's full and equal enjoyment of the facility, … if a barrier violating these standards relates to a plaintiff's disability, it will impair the plaintiff's full and equal access, which constitutes discrimination under the ADA, … the ADA specifically does not require that the disabled individual personally encounter each architectural barrier as a predicate to seeking its removal, … even where barriers that were encountered are later remedied, an ADA plaintiff does not lose his standing to challenge unencountered barriers…."

Missud's trek back to the overflow lot was rife with hazards which aggravated his condition to say the least. The ¼ mile distance from coliseum to lot was compounded with curbs exceeding 12 inches in height without any ramps in sight. By the time Missud reached the outskirts of the overflow lot, his back was burning, sciatica set in, and he nearly tripped over collapsed chain link scattered about on the unlit shoulders of I-880's highway off-ramp. There were no pedestrian goat-paths among the trees to speak of, let alone concrete sidewalks. Once within the overflow lot, Missud nearly took a digger in a rut full of muddy water. People with back problems hobble about much like Frankenstein's monster who had very limited flexibility (and two lifts). Recovering from a muddy slip usually doesn't happen but rather results in a fall. The OCJV's mismanaged overflow lot already impaired Missud's full and equal access to these Defendants' facilities, and Missud will absolutely return to the Oakland Coliseum for the next annual family get-together sponsored by his father-in-law who buys everyone A's game tickets in June or July. That is a "real immediate threat of repeated injury in the future."

Per the court's 3-part test at Order 27/2: Missud is disabled according to ADA definitions *and* as recognized by this federal court; the OCJV had possession and control over the overflow lot; and Missud was denied safe passage to his car after walking through a maze of barbed wire, and assorted booby-traps which could have leveled him. God only knows what happened to the seniors stuck in their non-four-wheel-drive wheelchairs. (They might still be stuck in chain-link or buried in the mud).

These amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

D.    VIOLATIONS OF THE NATIONAL HIGHWAY SAFETY AND TRAFFIC ACT

Defendants have a duty to follow federal law which includes abiding by the terms in the NHSTA.  These Defendants willfully violated the NHSTA by failing to provide adequate pedestrian walkways, railings, landings, ramps, and other components which require separation from vehicular traffic, roadways, and thoroughfares as prescribed by the Act.

Amendment to Complaint Re: Order 27/14

According to several National Highway Traffic Safety Administration publications including: "Traffic safety facts: pedestrians"- Report Number DOT HS-811-624, Washington DC: National Highway Traffic Safety Administration (2012b); "Pedestrian safety strategic plan: recommendations for research and product development publication" FHWA 10-035, Washington DC: Federal Highway Administration (2010), Zegeer, CV, Nabors D, Gelinne D, Lefler N, Bushell M; "How to develop a safety action plan. Final report prepared for FHWA, NHTSA."  Washington DC: Federal Highway Administration (2009), Zegeer CV, Sandt L, Scully M; …… and many others, there are many easy ways to protect vulnerable pedestrians from the onslaught of vehicular traffic.  Paraphrased, these include: Improving the design and materials of roadways and implementing programs. Some of the most important categories of engineering changes that can be made to roadways include separation of pedestrians from vehicles by time or space, measures that increase the visibility and conspicuity of pedestrians, and reduction of vehicle speeds. Separation countermeasures reduce the exposure of pedestrians to potential harm on the roadside and when crossing the street. Some effective separation countermeasures include: sidewalks, overpasses, underpasses, refuge islands in the medians of busy two-way streets, increased illumination and improved signal timing at intersections can be effective in increasing the visibility and conspicuity of pedestrians.

These same government reports are also referenced in third party publications at http://www.iihs.org/research/topics/pdf/r1186.pdf and http://safety.transportation.org/htmlguides/peds/types_of_probs.htm .

These Defendants violated each and every one of the NHSTA's safety guidelines for separating fragile human bodies from hurtling steel auto-bodies.  For instance, the Defendants sent their invitees to the overflow lot by requiring them to concurrently use the I-880 overpass with private and commercial traffic.  The northern side of said Overpass doesn't have any pedestrian pathway whatsoever.  The southern side of said Overpass has some pedestrian

walkway, complete with encumbrances, until one reaches the end terminating at the I-880 onramp.  On that side, there are no pedestrian signals thereby making 'jay-walking' or levitating a pedestrian's only two options to crossing to the lot.  The vehicles exiting the highway exit at highway speeds.  The cars and trucks merging onto the highway spool-up to highway speeds. Lighting at the western end of the overpass is dim at best which 'catches pedestrians in headlamps' much like flattened deer mowed down on winding rural roads. A hard left from that speedy off-ramp is required to use Zhone Way which must be crossed by pedestrians trying to access the overflow lot.  Missud has used this off-ramp an estimated 80 times going to P-n-P or A's games in his 6000-pound diesel Ram with a stopping distance of way-too-long.  Missud always looks twice *in daylight* to make sure that neither people nor deer are in the 'crosswalk' (which doesn't exist).[7]

These amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

E.     CAL-TRANS VIOLATIONS

Defendants have a duty to follow California state law which includes abiding by requirements established the California Transportation Authority [CTA].  These Defendants willfully violated CTA safety codes by failing to provide adequate pedestrian walkways, railings, landings, ramps, and other components which require separation from vehicular traffic, roadways, and thoroughfares as prescribed by the state.

Amendment to Complaint Re: Order 28/6

Among CalTrans' Mission Statements is to "provide the safest transportation system in the nation for users and workers." http://www.dot.ca.gov/hq/paffairs/about/mission.htm

Further, the Federal Highway Administration (FHWA) is an agency within the U.S. Department of Transportation that supports State and local governments in the design, construction, and maintenance of the Nation's highway system (Federal Aid Highway Program). Through financial and technical assistance to State and local governments, the Federal Highway

---

[7] This court claims at Order page 27 fn-14 that Plaintiffs "embellish allegations."  Not so- the NHSTA infractions are so severe, that Missud believes that the County of Oakland and/or O. Co. have already undertaken steps to ameliorate the problems. Licensed General Contractor Missud scoped out major public works in just that area which are apparently to improve pedestrian safety.  The squeaky wheel got some grease.

Administration is responsible for ensuring that America's roads and highways continue to be among the safest and most technologically sound in the world. http://www.fhwa.dot.gov/about/

CalTrans maintains federal highways like the I-5 Corridor and I-880 in Oakland. It does this under the supervision of both the FHWA and NHSTA. In fact CalTrans showcases improvements made to I-5 at its very own website:

"Interstate 5 (I-5), is the major north-south route that is used for inter-regional, interstate, and international travel and goods movement. It traverses diagonally about forty four miles through Orange County from San Diego County on the south to the Los Angeles County on the north. It serves as the backbone of Southern California Transportation network, connecting the major urban centers of Los Angeles, Orange, and San Diego Counties. The average daily traffic (ADT) varies from 115,000 to over 300,000 vehicles. Most major state and local routes in the county intersect I-5. Starting in 1988, there has been extensive widening on I-5 from SR 1 (PM 6.69) to the SR 91 (PM 42.10) interchange. The widening on I-5 between SR 1 and SR 22/SR 57 interchange was completed in early 1997. The widening project from the 5/22/57 (PM 34.00) interchange to SR 91 (PM 42.10) will be completed by late year 2000. Commuters on I-5 experience some morning and afternoon congestion on the recently completed segments, but much less than before. The remaining segments in the North County will see relief within a year."
http://www.dot.ca.gov/dist12/planning/

These Defendants are mis-using CalTrans-maintained thoroughfares, which are designed for vehicular traffic, as pedestrian pathways. These Defendants have no authority to mislead the public into thinking that the Zhone Way overpass is a safe pedestrian structure. They can no more require their Invitees to risk their life and limbs over that Overpass than have them play "Frogger" while crossing the 8 lanes of I-880.

These amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

F.    NEGLIGENCE

Defendants had a duty to provide adequate services to the Plaintiffs-Invitees. These Defendants, whose business is to professionally host events such as the Concert, did not provide adequate services to their Invitees. As a causal result of Defendants' breach of professional duties to provide adequate services, the Invitees were effectively barred from attending the Concert and constructively locked out of the Venue. Each Invitee who was barred from the

1  Concert and locked out of the Venue has been damaged in an amount to be proven at trial and

2  Defendants should be ordered to make restitution to the Plaintiffs.

3  <span style="color:red">Amendment to Complaint Re: Order 30/1</span>

4         At Order 30/13 this court cited that Tort damages are appropriate in contract claims when

5  the breach of a duty caused a consumer's physical injuries, there was a breach of the covenant of

6  good faith and fair dealing, and where the contract was fraudulently induced.  The improper

7  conduct alleged must have been intentional and intended to harm.

8         Specific to Missud, these Defendants' mismanagement of the overflow lot literally

9  caused the pain in his back and leg.  It was cheaper to have Invitees like Missud and his wife

10 park in a distant, federally-protected marshland- chock full of hazards, than find paved-parking

11 with safe pedestrian paths or provide shuttle services between the Venue and paved parking lot

12 for the 69,000 people expected for the Concert.

13        Generally to all Plaintiffs, these Defendants oversold the Concert knowing they hadn't

14 been able to appropriately manage events far short of the 69,000 people expected for U2.  These

15 Defendants took $95+++ per license, parking fees, and caused the Plaintiffs' other consequential

16 and incidental expenditures knowing that thousands would not make it to the Concert.  These

17 Defendants breached their covenant of good faith and fair dealing, and fraudulently induced the

18 Plaintiffs into forking over hard-earned wages to sit in traffic for hours.  These Defendants had a

19 well-established history of mismanaging much smaller events, and yet insisted on overselling the

20 Concert.  The Plaintiffs reasonable relied on these Defendants' representations that they could

21 handle the volume of Invitees.  These Defendants had a duty to provide adequate parking, traffic

22 control, and safe parking to all its Invitees.  One simple option could have been to rent a paved

23 lot at the Oakland airport and have a dedicated lane staffed with traffic control officers for shuttle

24 service.  However, these Defendants got cheap and funneled Invitees to a federally-protected

25 marsh to collect an additional $25 per vehicle.  Had these Defendants not tried to squeeze yet

26 more fees from the Invitees, then the Invitees might have had a chance to access the Concert.

27        These Defendants had a duty to provide access to the Venue.  After all, the Plaintiffs paid

28 for Seat Licenses *inside* the Venue.  However, prior to accessing the inside of the Venue, these

Defendants first wanted the Invitees to cough up another $25 per vehicle outside of the Venue to

1  park in pricey, muddy lots under their control.  That additional extortion caused the Invitees to sit

2  in traffic outside the Venue for hours.  The ridiculous amount of time that Plaintiffs wasted in

3  traffic outside the Venue to access these Defendants' overflow and other lots, so that they could

4  then access the inside of the Venue resulted in the Plaintiffs' many, many damages such as

5  increased transportation costs, baby-sitting fees, limo rentals, …, lost time, …., dashed

6  expectations, ….. and aggravation.  These Defendants wanted more of the Plaintiffs' cash, and

7  knowingly sacrificed their timely access to the inside of the Venue to boost profits.  This was

8  intentional and malicious, for which Tort Damages are available.

9      These amendments should suffice to overcome the court's perceived deficiencies with the

10  original Complaint.

11  G.    BREACH OF CONTRACT

12      The Plaintiffs purchased Licenses from, and had Contracts with, these Defendants.  The

13  Plaintiffs performed by timely arriving at the Venue for the Concert.  The Defendants breached

14  their counter-performance under the Contracts by constructively voiding Plaintiffs' Licenses.

15  The Defendants did not provide sufficient staffing or amenities to accommodate the 69,000

16  invitees who Defendants knew would be arriving for the Concert.  As a result of Defendants'

17  breach of contract, the Plaintiffs have been damaged in an amount to be proven at trial and

18  Defendants should be ordered to make restitution to the Plaintiffs.

19  Amendment to Complaint Re: Order 28/13

20      As a preliminary matter, and in answer to this court's footnote at the bottom of Order:29,

21  Missud and his wife purchased two seat Licenses from these Defendants, only one of which

22  timely honored [Section 328, Row 15, Seats 15 and 16].  The Licenses were purchased out of

23  community property funds through a credit card account terminating in numbers 331.  Per the

24  back of the Licenses, the "terms and conditions" are only available at www.ticketmaster.com

25  which this court might not want to acknowledge because it's an online source of information.

26  Missud independently searched the site which promotes all sorts of services and baubles, but

27  can't find the "terms and conditions" referenced on the back of the License.  That makes printing

28  out the "terms and conditions" kind of impossible.  Per Order 28/19 and *Otworth*, the verbatim

terms of the agreement/Ticket/License are: Front of Ticket- "Rain or Shine" [Note that it was a

clear, crisp evening]; Back of Ticket- "Call or email us if there is anything we can do to be helpful. Please visit www.ticketmaster.com for terms and conditions." There it is! That's it!! Missud can't find the "terms and conditions" at www.ticketmaster.com.

At 28/15, this Court lists the 4 elements required to plead breach of contract: (1) existence of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages.

All the many, many Plaintiffs (1) had a Ticket as described above, (2) timely arrived to the Venue for admission, (3) were directed by the Defendants in all sorts of weird directions through a maze of gridlocked cars to get an additional $25 per car thereby denying them admission to the Venue which they paid handsomely to enter, (4) and suffered damages but-for these Defendants' greed and insistence that they go to the overflow parking lot and other mismanaged facilities. Plaintiffs wasted money on the Tickets that weren't honored by these Defendants. Plaintiffs also suffered other foreseeable pecuniary losses such as gas, tolls, wear and tear, hotel stays, baby-sitter fees, flights fares in and out of the Bay Area, …. etc.

Although this court claims that services or "listed amenities" other than the Concert weren't necessarily offered under the Ticket/contract there are certain ancillary facilities which are required when hosting 69,000 Invitees. For instance, there has to be enough oxygen to support life. Water has to be provided both for consumption and to flush wastes to maintain a minimum sanitary environment. Safe promises must be secured and the overly-exuberant, metal-clad, face-painted, die-hard Raiders fans kept in check. Orderly ingress and egress must be maintained. In the event of an earthquake, an adequate escape plan needs to be followed after the emergency lighting kicks-in. Sufficient facilities of all kinds to accommodate 69,000 people in the stadium need to be in place *before* the throngs of Concert-goers arrive at the Venue.

Had there been an earthquake, it would have taken longer than just the four hours that the Plaintiffs maintain they were stuck in traffic to escape. Emergency services would likewise have been stuck and lives no doubt lost. Just because the services which are required to support a Concert aren't specifically enumerated on the Ticket or under "terms and conditions" yet to be found, that doesn't mean they aren't necessary when a multi-million-dollar consortium of private/public special interests want to make lots of money hosting 69,000 people. A traffic control plan and adequate parking were a must for this event. Some Oakland Police and private

agents were even assigned to patrol/manage the traffic but they were either incompetent or too few in number.  Res Ipsa Loquitor- something under these Defendants' control went awry, and only they know how and why it was botched.  More than likely they cut corners to maximize profits and risked the Plaintiffs' access to their Venue (& lives) to boost their own bottom line$.

These amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

H.    FRAUDULENT INDUCEMENT

The Defendants knowingly oversold the Concert.  They knew that they didn't have sufficient amenities to accommodate 69,000 Invitees.  These Defendants nevertheless misrepresented they could accommodate all of the Invitee-Plaintiffs.  Plaintiffs were fraudulently induced into buying Licenses which these Defendants knew would not be honored.  As a result of Defendants' fraudulent inducement, the Plaintiffs were damaged in an amount to be proven at trial and Defendants should be ordered to make restitution to the Plaintiffs.

Amendment to Complaint Re: Order 31/14

At Order 31/17 this court cites to *Hinesly* wherein under fraudulent inducement, "the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud is voidable."  Thereafter, this court specifies that fraud in the inducement must be pled to heightened FRCP Rule-9 standards- ie: the who, what, where, when and why of the fraud.

These Plaintiffs, and each and every one of them, believed that since their Licenses were offered for sale, they would be guaranteed admission to the Concert if they performed per contract and arrived timely- not the day before, and not the day after.  In every case, the Plaintiffs arrived with time to spare.  They planned on attending the Concert for over one year since the original date was postponed for just as long.  Several Plaintiffs made special arrangements including booking flights, hotel rooms, dinner reservations, and limousines to and from the Concert, and post-Concert events.  They all planned far in advance, and allowed ample time for these Defendants to honor their part of the bargain- namely to allow admission to the Venue.  Unfortuneately, these Defendants' 'professional' planning fell far short of reasonable expectations.

The who, what, where, when and why of the fraudulent inducement are as follows.  Who: The Defendants failed to adequately plan for the 69,000 Invitees who had adequately planned their arrivals to the Venue to attend the Concert.  The Defendants publicly offered 69,000 seat Licenses which the public understood to mean that they would all be honored.  The Plaintiffs all performed under the contract by paying valuable consideration for their Tickets/Licenses and arrived to the Venue with time to spare.  What:  The Defendants promised to put on an epic Concert, and the Plaintiffs gleefully bought Tickets to witness the event.  Where: The O. Co. is off of I-880 appurtenant to Zhone Way.  When: The Concert was originally scheduled in 2010, but then set for June 7, 2011 and these Defendants had *over two years [730 days] to adequately plan* for the arrival of *sixty-nine-thousand* [69,000], [6.9 X 10^4] Invitees.  Why: The reason that these Defendants completely mismanaged the Concert is known only to them.  Most likely they sought to maximize profits by minimizing their own expenses.  In doing so they risked the Plaintiffs' already-paid Tickets, admission to the Venue, and all foreseeable consequential and Incidental expenses planned since 1-2 years.[8]

These amendments really should suffice to overcome the court's perceived deficiencies with the original Complaint.  Otherwise these ultra-capitalized Defendants might just get off the hook for having preyed on mere members of the public.

I.     B&PC§17,200 DECEPTIVE TRADE PRACTICES

The DTP proscribes fraudulent business acts or practices which are unfair, deceptive, untrue, or misleading.  These Defendants engaged in fraudulent acts by selling more Licenses for the Concert at the Venue than they were capable of accommodating with their facilities and amenities.  Further, the Defendants advertised the Concert in a way which misled the Plaintiffs-Invitees to believe that their Licenses, once bought, would be honored at the Venue for the Concert.  As a result of Defendants' unfair, unlawful and deceptive acts and practices, Plaintiffs

---

[8] Other examples of FRCP heightened pleading standards catching federal judges in lies are filed in the Response addressing this court's March 5, 2013 Order and supporting this First Amended Complaint.  Federal Informants like Missud can catch federal judge$ in corporate back-pocket$, but for some reason other reviewing Circuit judge$ are happy to ignore the FRCP Rule-9 mandate that such pleadings be con$idered.  Now why i$$$$$$ that?

1    were damaged in an amount to be proven at trial and Defendants should be ordered to make
2    restitution to the Plaintiffs.

3    Amendment to Complaint Re: Order 21/1 and32/21

4          This court requires more facts pled to heightened FRCP Rule-9 standards.  Here they are.
5    Standing: All Plaintiffs, including the Missuds, learned of the Concert through some means of
6    advertisement.  Bono did not personally call 69,000+ people to come to his 360 Tour.  These
7    Defendants are the ones who orchestrated the advertising which resulted in the sold-out Concert.
8    Unlawful Prong: By offering the 69,000 seat licenses these Defendants represented they could
9    handle a crowd that size.  They offered the 69,000 seats knowing that they couldn't even handle
10   a fraction of that crowd which attended Raiders games.  The$e Defendants were driven by greed
11   to sell the maximum number of $95+++ Tickets whether or not they could handle the crowd.
12   Fraudulent Prong: Missud admits that none of the Defendants confessed they were driven by
13   greed to sell the maximum number of tickets even though they knew that they couldn't handle
14   the crowd based on past experiences.  What Missud has is indirect evidence gathered from the
15   circumstances.  That's also called circumstantial evidence which is all that's required to plead
16   under FRCP Rule-9.  Unfair Prong: The prima-facie evidence that these Defendants violated
17   public policy is well-documented.  Invitees were stranded in traffic for hours.  They were
18   backed-up in highway lanes.  First responders could not have navigated the gridlocked traffic.
19   Had there been an earthquake, hours would have elapsed before the Venue could have been
20   evacuated.  These Defendants feigned being able to provide ancillary services which are essential
21   to hosting an event which 69,000 people will attend.  Public policy dictates that private-public
22   entities like the OCJV shouldn't put Invitees lives in peril to maximize profits.  Public policy
23   also dictates that private-public partnerships like the SMG Corporation and County of Oakland
24   shouldn't promise Invitees access to the Venue by pre-conditioning entry to buying a parking
25   space in their muddy 'overflow lot.'[9]

26
27
28   [9] In Order 35 fn-17 and 18 this court intimates that because tickets holders weren't specifically promised parking
     that they weren't entitled to it.  Nor were the Invitees promised clean air, un-poisioned water, or premises free from
     sharp objects like shards of glass, and surgical scalpels facing up and attached to handrails.  Common sense dictates
     that bare minimums are required when hosting 69,000 people.  Safe premises, and reasonable access to the Venue

These amendments should suffice to overcome the court's perceived deficiencies with the original Complaint.

Amendment to Complaint Re: Order 36/9

Should the Defendants renew their Motion to Strike Punitive Damages, references to websites, for attorney's fees and the like, then Plaintiffs will oppose said Motions at that time.

XI. PRAYER FOR RELIEF

1.    That Defendants immediately cease using their "overflow parking lot" located at 66th and Oakport Street, or any other similar facility under their control, until such time that they have taken appropriate measures to comply with the CWA and RCRA.  The Defendants are currently polluting a federal wetland located 50 feet NW of the Oakport/Zhone Way intersection.  The wetland is located WITHIN the "overflow parking lot."  The Defendants' compliance with CWA and RCRA is currently non-existent.  These Defendants should be enjoined from using the "overflow parking lot" until such time that they have complied with the Acts.

2.    That the Defendants immediately cease using their "overflow parking lot" located at 66th and Oakport Street, or any other similar facility under their control, until such time that they have taken appropriate measures to comply with the ADA.  There are NO ADA compliant facilities, curbs, walks, handrails or ramps between the "overflow parking lot" and the Venue.  There are only weed filled goat-paths found between collapsed chain link fence and barbed wire interlinking said "overflow parking lot" and Venue.  Minimum walk widths, ascent angles and railings are non-existent in blatant violation of the ADA. There is absolutely no compliance with the ADA.  These Defendants should be enjoined from using the "overflow parking lot" or any similar facilities until such time that they have complied with the ADA.

3.    That the Defendants immediately cease using their "overflow" parking lot located at 66th and Oakport Street, or any other similar facility under their control, until such time that they have taken appropriate measures to comply with the NHSTA.  Pedestrians using the Defendants' "overflow parking lot" share the same vehicular paths to access the Venue as speeding trucks

within FOUR hours is among them.  Res Ipsa Loquitor- only the Defendants know what happened, this court is to liberally construe Plaintiffs claims and should favor trial on the merits.  Those details will come out at trial.

weighing over 20,000 pounds which access Interstate 880 via 66th Street and Zhone Way.  There is currently no compliance with either NHSTA or Cal-Trans safety requirements vis a vie separation of pedestrians and multi-ton motorized vehicles: http://en.wikipedia.org/wiki/Traffic_safety#Designing_for_pedestrians_and_cyclists.  These Defendants should be enjoined from using the "overflow parking lot" or any similar facilities until such time that they have complied with the NHSTA and Cal-Trans safety requirements.

4.     That the Defendants immediately cease using their "overflow parking lot" located at 66th and Oakport Street, or any other similar facility under their control, until such time that they have taken appropriate measures to comply with basic duties to inspect their premises for hazards per codified California invitee statutes.  Currently, their are mounds of refuse, deep water-filled potholes, cavernous ruts, collapsed chain link fencing, slick mud, assorted other trip and slip hazards, and rusted barbed wire surrounding the perimeter of the Defendants' "overflow parking lot" for which there is no lighting.  In the darkness, all of these hazards are non-obvious and require immediate remediation.  The Defendants are making no efforts to insure Invitee safety on the premises under their control.  These Defendants should be enjoined from using the "overflow parking lot" or any similar facilities until such time that they have complied with safety measures codifies by California statutes which regulate premises open to the public.

5.     That the Defendants make restitution for all Plaintiffs-Invitees having been physically or financially injured, by Defendants' mismanagement of premises within their control, including their "overflow parking lot" located at 66th and Oakport Street, or any other similar facility.

6.     That the Defendants make restitution for all Plaintiffs-Invitees having been financially injured, effectively barred from attending the Concert, and/or constructively locked out of the Venue by Defendants' mismanagement of premises within their control, including their "overflow parking lot" located at 66th and Oakport Street, or any other similar facility.

7.     That the Defendants make restitution for all Plaintiffs-Invitees whose Licenses were not honored by Defendants after Plaintiffs paid for said Licenses to attend the Concert at the Venue.

8.     That the Defendants pay punitive and/or non-compliance fees/damages under federal statutes, in an amount sufficient to deter them from continuing their persistent, brazen, and

egregious violations of four federal acts inclusive of CWA, RCRA, ADA, NHSTA/Cal-Trans, and California Invitee statutes.

9.    That the Defendants be enjoined from selling more seats Licenses to Events than they can reasonably accommodate when considering Venue safety and accessibility concerns of their "overflow parking lot" or any other similar facility.

10.    That the Defendants pay punitive damages in an amount sufficient to deter them from misrepresenting the capacity of the Venue, fraudulently inducing License sales, and/or overselling seat Licenses as has been their pattern and practice over the years.

11.    That the Defendants pay punitive damages in an amount sufficient to deter them from conducting fraudulent business acts or practices which are unfair, deceptive, untrue, or misleading per B&PC§17,200 Deceptive Trade Practices code.

12.    Attorneys' fees, costs, and any and all other related fees for this suit.

13.    Any other fair, just, or equitable awards as this court deems fit for consumer protections from the corporate interests that seek only to maximize their profits at consumer expense, health and welfare.

XII. PEREMPTORY CHALLENGES TO JUDICIAL ASSIGNMENTS

This Plaintiff in Pro-Per has and/or had several actions before this Oakland Division's judges.  As such there are conflicts of interest for which the following judges should recuse:

A.    Saundra B. Armstrong; case 07-2625-SBA; *Missud v. D R Horton*; Fraud and Misrepresentation by a Fortune-500 corporate special interest; approximately 800 documents proving the corporation's predatory lending and mortgage fraud were ignored by the federal court prior to case dismissal and just one year before the mortgage meltdown;

B.    Phyllis J. Hamilton; case 11-cv-1856-PJH; *Missud v. San Francisco Superior Court*; Federal Arbitration Act Racketeering by two SF Superior Court judges and an arbitrator who game the FAA to favor corporate special interests; approximately 800 documents proving Superior Court FAA-RICO were ignored by the federal court prior to case dismissal under the 'doctrine of judicial immunity;'

C.    Donna M. Ryu; case 12-cv-161-DMR; *Missud v. D R Horton, SEC etal.*; Official corruption by the Fortune-500 corporation to conceal its decade-long predatory lending and

mortgage fraud which caused thousands of consumer bankruptcies and foreclosures nationwide; approximately 5000 documents proving corporate predation of consumers in 27 states are registered for consideration by judge Ryu in her forthcoming decision.

In the event that this Oakland Division transfers venue, as it did with 11-cv-1856-PJH and 11-cv-3567-EMC, then the following San Francisco Division judges should likewise recuse:

D.    Susan Illston; case 10-cv-235-SI; *Missud v. D R Horton, et al. (Nevada officials and judges)*; Official corruption of Nevada state officials and judges by the Fortune-500 corporation to conceal its decade-long predatory lending and mortgage fraud which caused Nevada to become the nation's foreclosure capitol; approximately 2000 documents proving corporate predation of consumers throughout Nevada were registered prior to voluntary dismissal by 18 USC §1513 federal informant Missud;

E.    Edward M. Chen; case 11-cv-3567-EMC; *Missud v. D R Horton, et al*; Corporate racketeering which includes official corruption of Nevada and California state officials and judges by the Fortune-500 corporation to conceal its decade-long interstate predatory lending, mortgage fraud, antitrust, deceptive trade, consumer extortion, TILA, RESPA, EOCA violations, …. which in great part caused this nation's near financial collapse; over 120 registered docket entries and 5000 documents proving corporate predation of 311 million Americans made possible by judge$ acting under the color of law that the 'doctrine of judicial immunity' afford$ them.

//

Re-vied by 18 USC §1513 federal informant Missud,


*Patrick Missud*                    April 29, 2013
Patrick Missud                          Date